**EAGLE–PICHER INDUSTRIES, INC., Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,**

State of Maine, et al., State of New Jersey, et al., Commonwealth of Virginia, State of New Mexico, et al., St. Joe Minerals Corporation, Edison Electric Institute, et al., Intervenors.

**UNITED NUCLEAR CORPORATION, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

Edison Electric Institute, et al., Intervenors.

**HOMESTAKE MINING COMPANY, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

Edison Electric Institute, et al., Intervenors.

**HOMESTAKE MINING COMPANY, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

Edison Electric Institute, et al., Intervenors.

**COTTER CORPORATION, Petitioner,**

v.

**William D. RUCKELSHAUS, et al., Respondents,**

Edison Electric Institute, et al., Intervenors.

---

INMONT CORPORATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Respondents.

SOLVENTS RECOVERY SERVICE OF
NEW ENGLAND, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

VIRGINIA ELECTRIC AND POWER
COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Respondents,

Edison Electric Institute, et
al., Intervenors.

Nos. 83–2259 to 83–2266.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 28, 1985.
Decided April 16, 1985.

Richard A. Flye, Washington, D.C., with whom Christian Volz, Washington, D.C., was on brief for petitioner, Eagle-Picher Industries, Inc., in No. 83–2259 and the joint brief for petitioners on Common Issues in Nos. 83–2259, et al.

G. Stanley Crout, Santa Fe, N.M., with whom Michael S. Yesley, Santa Fe, N.M., and Peter J. Nickles, Washington, D.C., were on brief for petitioner, United Nuclear Corporation, in No. 83–2260 and the joint brief for petitioners on Common Issues in Nos. 83–2259, et al. Mr. Crout also entered an appearance for petitioner, Homestake Mining Company, in Nos. 83–2261 and 83–2262.

Ridgeway M. Hall, Jr., Washington, D.C., for petitioner, Homestake Mining Company, in Nos. 83–2261 and 83–2262. Ridgeway M. Hall, Jr., Washington, D.C., was also on joint brief for petitioners on Common Issues in Nos. 83–2259, et al. and brief for petitioner, Homestake Mining Company, on Issues Specific to Whitewood Creek, South Dakota.

Daniel J. Dunn, Denver, Colo., with whom Edward J. McGrath, was on the joint brief on Common Issues for petitioner, Cotter Corporation, in Nos. 83–2259, et al. Daniel J. Dunn, Denver, Colo., and Edward J. McGrath also entered appearances for petitioner, Cotter Corporation, in No. 83–2263.

Daniel H. Squire, Washington, D.C., with whom David B. Weinberg, Washington, D.C., was on brief for petitioner, Inmont Corporation, in No. 83–2264 and intervenors, Edison Electric Institute, et al. in Nos. 83–2259, 83–2260, 83–2261, 83–2262, 83–2263 and 83–2266.

Barry L. Malter, Washington, D.C., was on the brief for petitioner, Solvents Recovery Service of New England, Inc., in No. 83–2265.

William L. Rosbe, Richmond, Va., for petitioner, Virginia Electric and Power Company, in No. 83–2266.

Samuel I. Gutter, Atty., Environmental Protection Agency, Lawrence R. Liebesman and Michael W. Steinberg, Attys., Dept. of Justice, Washington, D.C., with whom Todd E. Gulick, Attorney and A. James Barnes, Gen. Counsel, Environmental Protection Agency, Washington, D.C., were on brief, for respondents in Nos. 83–2259, et al. David T. Buente, Washington, D.C., entered an appearance for respondent, Dept. of Justice, in Nos. 83–2259, et al.

James T. Kilbreth, III, Washington, D.C., was on brief for intervenors, State of Maine, et al., in No. 83–2259.

Patrick A. O'Hare, Richmond, Va., was on brief for intervenor, Commonwealth of Virginia in No. 83–2259.

Charlotte Uram, Santa Fe, N.M., was on brief for intervenors, State of New Mexico, et al., in No. 83–2259.

Everett B. Carson, Augusta, Maine, was on brief for Natural Resources Council of Maine, amicus curiae, urging dismissal in Nos. 83–2259, et al.

Mary C. Jacobson, Trenton, N.J., entered an appearance for intervenors, State of New Jersey, et al., in No. 83–2259.

Robert A. Emmett, Washington, D.C., was on brief for intervenor, St. Joe Minerals Corporation, in No. 83–2259.

Before ROBINSON, Chief Judge, EDWARDS, and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case calls on us to examine the complex web of "Superfund" legislation passed by Congress in the waning days of 1980. Specifically, we are presented with contentions pressed by certain mining companies and an electric utility that their facilities were improperly included by the Environmental Protection Agency on a nationwide list of priority sites under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* (1982) ("CERCLA" or "the Act").

I

CERCLA was designed to address the growing problem of inactive hazardous waste sites throughout the United States. The Act authorizes the Environmental Protection Agency ("EPA") to respond to the release of both "hazardous substances" and those "pollutants or contaminants" the release of which may present "an imminent and substantial danger to the public health or welfare," as those terms are defined in the Act. A response by EPA can be of two kinds: removal, or remedial action. Removal actions involve the actual cleanup of a release, 42 U.S.C. § 9601(23). Remedial actions are those actions consistent with a

permanent remedy to prevent or minimize the release of hazardous substances. *Id.* § 9601(24).[1]

To enable EPA to respond to those sites most urgently in need of cleanup, EPA is required under section 105(8)(B), 42 U.S.C. § 9605(8)(B), to compile the National Priorities List ("NPL") of releases or threatened releases throughout the United States. The petitioners in these consolidated cases object to the placement of their respective facilities on the NPL and advance various arguments as to why the EPA's actions were purportedly in error. This opinion addresses the contentions of petitioners Eagle-Picher Industries, Inc., Homestake Mining Company, United Nuclear Corporation, Cotter Corporation, and Virginia Electric and Power Company (Vepco) that CERCLA was not intended to authorize EPA to place sites that produce mining wastes or fly ash on the NPL.[2] We will also address the claims by three petitioners, Homestake Mining Corporation, United Nuclear Corporation, and Cotter Corporation, that the EPA cannot lawfully place sites on the NPL that are currently regulated by their respective States pursuant to agreements with the Nuclear Regulatory Commission.[3] For the reasons that follow, we deny the petitions for review as to the specific contentions addressed herein.

## II

Petitioners first claim that mining wastes and fly ash are not "hazardous substances" within the meaning of CERCLA.[4] The piv-

otal term, "hazardous substance," is defined rather elaborately in section 101(14) of the Act, 42 U.S.C. § 9601(14):

"[H]azardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas)....

Petitioners ground their claim on the parenthetical clause found in subclause (C) of this complex provision, which expressly re-

---

**1.** CERCLA provides for a fund to finance the cleanup of sites (the "Superfund"), 42 U.S.C. § 9631, and imposes liability for cleanup on past and present owners of sites with hazardous substances situated thereon, as well as generators and transporters of hazardous substances, 42 U.S.C. § 9607.

**2.** The Eagle-Picher sites at Tar Creek, Oklahoma and Cherokee County, Kansas; Homestake Mining sites at Milan, New Mexico, and Whitewood Creek, South Dakota; and United Nuclear site at Churchrock, New Mexico are mining sites that contain mining wastes. Vepco's Chisman Creek, Virginia, site contains fly ash waste, a by-product of the combustion of coal and small amounts of coke. No specific site of the Cotter

Corporation is involved in this case; rather Cotter is challenging the general authority of EPA to regulate mining wastes. These five companies are referred to collectively as "petitioners."

**3.** Other issues raised by the petitioners, including the use of the Hazard Ranking System and the various site-specific questions, will be addressed in other opinions by the court. 751 F.2d 137.

**4.** As previously indicated, a separate statutory branch of coverage is provided by the terms "pollutant or contaminant." This separate and independent basis of jurisdiction is discussed in Part III, *infra.*

fers for its definitional purposes to several other federal statutes. That parenthetical clause applies by its terms to petitioners, inasmuch as both mining wastes and fly ash have been suspended from regulation under the Solid Waste Disposal Act (which includes the subsequently passed statute known as "RCRA"). *See* 42 U.S.C. §§ 6921(3)(A)(i), 6921(3)(A)(ii) (1982). From this exclusion, petitioners draw the conclusion that mining wastes and fly ash are thus excluded as well from CERCLA's definition of "hazardous substances."

### A

■ Notwithstanding its superficial appeal, petitioners' argument suffers from a mortal flaw, namely that their interpretation does not comport with the plain meaning of the entire statutory provision. As EPA notes,[5] a substance is a "hazardous substance" within the meaning of CERCLA if it qualifies under *any* of the several subparagraphs of section 101(14). The exception for mining wastes and fly ash is found only in a parenthetical clause in subparagraph (C). The ordinary, straightforward reading of that exception is that it applies only to subparagraph (C), not to any of the other five subparagraphs. Had Congress intended to exempt mining wastes and fly ash from the entirety of section 101(14), it obviously could have

placed the exemption at the beginning or end of the section, not in one of the several subparagraphs. Indeed, this is precisely what Congress did do with respect to other specific substances. At the conclusion of section 101(14), a *general exception* from the definition of "hazardous substance" is carved out for petroleum and natural gas products. Had Congress intended to create a similarly broad exception for mining wastes and fly ash, the Legislature readily could have placed that exception alongside the petroleum and natural gas exceptions.[6]

Petitioners argue that such an interpretation must be rejected for two reasons: *first*, that the interpretation would render meaningless the exception in subparagraph (C), and *second*, that the legislative history of CERCLA clearly shows that the subparagraph (C) exception was meant to exempt totally such wastes from the term "hazardous substance."

As to the first argument, petitioners observe that EPA labels as "hazardous substances" the mining wastes and fly ash produced by petitioners because those wastes contain substances, such as arsenic, cadmium, and selenium, which are regulated under one or more of the several environmental statutes referred to in section 101(14).[7] Petitioners claim that virtually all mining wastes and fly ash contain at

---

**5.** In reviewing the interpretation of a statute by the agency that administers it, a court must first determine if Congress "has directly spoken to the precise question at issue," and if Congress' intent is clear, the court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. —, 104 S.Ct. 2778, 2781–82, 581 L.Ed.2d 694 (1984) (footnote omitted). If Congress' intent is not clear, however, the court "must conduct the 'narrower inquiry into whether the [agency's] construction was "sufficiently reasonable" to be accepted by a reviewing court.'" *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1567 (D.C.Cir.1984) (en banc) (quoting *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (footnote omitted).

**6.** Two district courts that have addressed this issue have also concluded that the plain meaning of section 101(14) is that the exception in subparagraph (C) applies only to that subpara-

graph, and that the plain meaning should control. *See United States v. Union Gas Co.,* 586 F.Supp. 1522 (E.D.Pa.1984); *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143 (D.Ariz. 1984). The *Metate Asbestos* court bolstered its interpretation by relying upon the "doctrine of the last antecedent," a canon of statutory construction which "states that qualifying words, phrases and clauses must be applied to the words or phrase immediately preceding them and are not to be construed as extending to and including others more remote." *Id.* at 1147. In light of the language of the entire provision, as well as the structure of that provision, we do not deem it necessary to employ that doctrine in order to construe section 101(14). Canons of construction are, after all, only aids in the process of statutory construction, nothing more, nothing less.

**7.** Petitioners also object to listing substances based upon their constituent elements. *See infra* page 930.

least trace amounts of substances that qualify as "hazardous substances" under one of section 101(14)'s subparagraphs. Thus, they argue, EPA's interpretation would render all or virtually all mining wastes and fly ash CERCLA-covered "hazardous substances," with the effect of denuding the exception in subparagraph (C) of any efficacy whatsoever. Since, petitioners argue, courts should under settled principles reject a proffered statutory interpretation which renders any part of the statute meaningless where a reasonable alternative interpretation exists, we should be constrained to embrace their proposed construction which breathes life into all of CERCLA's definitional provisions.

Unfortunately for petitioners, they have cited nothing in CERCLA, its legislative history, or the record in this case demonstrating that all or virtually all mining wastes and fly ash have constituents which are "hazardous substances." We have nothing more than petitioners' bare assertions on this point. Likewise, petitioners have presented nothing demonstrating that Congress was of the view that all or almost all mining wastes and fly ash contain hazardous substances.[8] It is quite possible that Congress was unconvinced that enough was known about mining wastes and fly ash for EPA to decide that those substances, as a general rule, posed a threat to the environment, but at the same time Congress may have been willing to bring any mining wastes and fly ash found to contain "hazardous substances" within the ambit of section 101(14). Without a showing that Congress believed that the regulation of mining wastes and fly ash under other subparagraphs of section 101(14) would render the exception in subparagraph (C) meaningless, we are disinclined to reject the plain meaning of section 101(14).

Petitioners' second argument relies most heavily upon a single sentence extracted from the Senate Report on S. 1480, the Senate version of CERCLA. That Report is particularly pertinent because the definition of "hazardous substance" originated in the Senate bill. The Senate Report discussed specifically what substances would be "hazardous substances" under what was destined to become the critical provision for our case, section 101(14) of CERCLA. In its discussion of subparagraph (C), the Report stated: "It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the Solid Waste Disposal Act is excluded from designation as a hazardous substance for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical." S.REP. No. 848, 96th Cong., 2d Sess. 28 (1980). Petitioners argue that this sentence clearly demonstrates that the Senate, which placed the exception in subparagraph (C), intended the exception completely to exempt mining wastes and fly ash from CERCLA's coverage.

It is beyond reasonable debate that the language of the Senate Report is clear, and that the import of that language is that the exception set forth in subparagraph (C) extends, as it were, throughout all of section 101(14). But, as we noted above, the language of section 101(14) is itself quite clear and, in our view, indicates that the exclusionary exception should be limited to subparagraph (C). Each side to this dispute has earnestly attempted to demonstrate that the language purportedly supportive of the other side's position is, upon analysis, ambiguous. EPA claims that since the sentence in the Senate Report is found in the context of a discussion of subparagraph (C), the sentence "speaks only to the question whether mining wastes (and other 'suspended' wastes) are CERCLA 'hazardous substances' *because they are regulated under RCRA*." EPA Brief at 73 (em-

---

**8.** Indeed, the section of the Solid Waste Disposal Act, as amended by RCRA, that suspends the regulation of mining wastes and fly ash clearly states that those substances can be regulated under other applicable provisions of federal law. *See* 42 U.S.C. § 6921(3)(A) (1982).

phasis in original).[9] Petitioners argue, in contrast, that the placement of the exception in subparagraph (C), rather than alongside the general exception, is "immaterial." Joint Brief for Petitioners at 19.

We can accept neither side's argument as carrying the day. Although the sentence in the Senate Report is indeed located in the discussion of subparagraph (C), as EPA emphasizes, the sentence nonetheless unambiguously states, as petitioners emphasize, that any suspended substance "is excluded from designation as a hazardous substance for the purpose of S.1480." S.1480 was the entire proposed bill, not just subparagraph (C). On the other hand, we cannot dismiss the placement of the exception as utterly irrelevant. If a rational draftsman had indeed intended that the exception encompass all of section 101(14), he or she would presumably have placed that exception at the end of the section, along with the petroleum and natural gas exceptions. The draftsman would not, in the face of general exceptions, have relegated a purported general exception to the odd location of a parenthetical provision in a solitary subclause.

■ We thus are faced with a conflict between the language and structure of the statute, on the one hand, and one portion of its legislative history on the other. It is clear to us that when such a conflict exists, the statute must control. It was, after all, section 101(14) that was enacted by Congress and became law. If there were very clear legislative history indicating that Congress had an intent contrary to that expressed in the statute,[10] *and* particularly if application of the language would lead to an irrational result that Congress could not have intended, courts might well be justified in departing from the clear language and structure of the statute.[11] But as we

9. RCRA, as we observed above, amended part of the Solid Waste Disposal Act referenced in § 101(14)(C).

10. We should note that the quoted sentence does not come from a conference report. It is true that the definition of "hazardous substance," and the exception in subclause (C), originated in the Senate, and thus should be accorded more weight than an ordinary Senate report. Nevertheless, it is section 101(14), not the report of one body, that was passed by the entire Congress.

11. *See United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1960); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106–07 (D.C.Cir.1976); *Shackleford v. United States*, 383 F.2d 212, 215 & n. 6 (D.C.Cir.1967); *Montgomery Charter Serv., Inc. v. Washington Metropolitan Area Transit Comm'n*, 325 F.2d 230, 233 (D.C.Cir.1963) (" 'It is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper.' ") (quoting *Elm City Broadcasting Corp. v. United States*, 235 F.2d 811, 816 (D.C.Cir.1956)).
 Admittedly, a superficial review of what courts have done in determining the circumstances when it is deemed appropriate to depart from the clear meaning of a statute would suggest that the judiciary's record has not been one of unremitting consistency. Within this circuit, the articulation of these themes has varied. In *Wilderness Society v. Morton*, 479 F.2d 842, 855

(D.C.Cir.) (*en banc*), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), for example, we stated that

> [o]n occasion we have paid lip service to the rule that where the language of a statute is clear and unambiguous on its face it cannot be controverted by seeking to show inconsistent legislative intent, but we have also faced up to the reality that "the 'plain meaning' doctrine has always been subservient to a truly discernible legislative purpose however discerned."

(citations omitted). But on further analysis, it is clear that we were not engaging there in what some might perceive as the fashion of the day, namely a quick nod toward the statute before examining the presumptively more enlightening and edifying history of the measure as it wended its way through the process of passage. Rather, we looked in that case beyond the plain language of the statute because it was claimed that the statute's plain meaning led to an irrational result—the statute in that case was designed to allow oil companies to build pipelines, but as it turned out, the 25-feet right-of-way that Congress allowed was too small, and thus no large diameter pipelines could be built. Given this context, the rule of *Wilderness Society* is simply reflective of the sound teaching of *Elm City Broadcasting, supra*. This, in fact, is precisely the way in which *Wilderness Society* was subsequently interpreted in *Aviation Consumer Action Project, supra*.
 Other cases, however, employ language so broad as to suggest that legislative history must always be examined, regardless of the language

demonstrated above,[12] both the language and carefully crafted structure of section 101(14) do not render any part of CERCLA meaningless, nor does the resulting construction lead to an unreasonable result.

■ Finally, even if we did not feel compelled to adopt the plain meaning of section 101(14), we would have to reach the same result, because in this situation, we are not persuaded that the legislative history evidences Congress' clear intent. The best case to be made for petitioners, upon analysis, is that when one examines the statute and the specific part of the legislative history upon which they rely, it becomes unclear as to what Congress' intent actually was. However, when Congress' intent is unclear, settled principles of law require us to determine whether EPA's interpretation is sufficiently reasonable for us to accept that interpretation.[13]

■ Our discussion of section 101(14), *supra*, demonstrates to our satisfaction that EPA's interpretation is eminently reasonable. Indeed, it would be impossible to call EPA's interpretation unreasonable when the plain, straightforward meaning of section 101(14) is that the exemption in subparagraph (C) applies to that subparagraph, and when that plain meaning does not lead to an irrational result. Therefore, based upon the clear language of section 101(14), we conclude that the exception set forth in section 101(14)(C) does not prevent a substance from being labelled a "hazardous substance" if it falls within another subparagraph of section 101(14).

■ Petitioners, however, do not end their argument there. To the contrary, they claim that EPA has no authority under CERCLA to classify certain wastes as "hazardous substances" merely because one or more of their constituent elements fall within one or more of the subparagraphs of section 101(14). Petitioners argue that mining wastes and fly ash must be *specifically* listed under one or more of the subparagraphs if they are properly to be deemed "hazardous substances" under the statute. If it were otherwise, they claim, virtually all mining wastes and fly ash would constitute "hazardous substances," because, in their view, virtually all contain at least trace amounts of "hazardous substances"; and the result, petitioners contend, would then be that the exclusion in subparagraph (C) would be rendered meaningless. However, as we previously stated,[14] petitioners have failed

of the statute. *See, e.g., Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 379–80 (D.C.Cir. 1973) ("In ascertaining congressional intent we begin with the language of a statute, but this is subject to an overriding requirement of looking to all sources including purpose and legislative history, to ascertain discernible legislative purpose.") (footnotes omitted); *District of Columbia National Bank v. District of Columbia,* 348 F.2d 808, 810 (D.C.Cir.1965) ("And since the judicial function is to ascertain the legislative intention the Court may properly exercise that function with recourse to the legislative history, and may depart from the literal meaning of the words when at variance with the intention of the legislature as revealed by legislative history.").

Notwithstanding the looseness infecting some of the decisional law's language the correct rule is, as the Supreme Court itself squarely taught in *United States v. Oregon, supra,* that resort is not to be made to the legislative history when the statute is clear and fidelity to the plain language does not lead to an irrational result. The statute is, after all, the only measure which is laid before all members of Congress; and the statute is the only true indicator of what the

members, collectively, believed the statute said. We must also keep in mind, in this respect, the oft-forgotten, bedrock fact that the President has an indispensable role to play under the Constitution: "lawmaking [is] a power to be shared by both Houses and the President." *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 2782, 77 L.Ed.2d 317 (1983). As every civics student presumably knows, and as *Chadha* confirmed, all bills must be presented to the President before they become law, and they only become law if the President approves, absent the overriding of a veto by two-thirds of the House and Senate. U.S. Const. Art. I, § 7. Thus, what the President believed the bill meant is likewise of relevance to the process of a bill's ultimately becoming law. And the only authoritative document indicating the meaning of a statute that we can safely assume would have been considered by the President is the statute itself.

12. *See supra* pages 927–28.

13. *See supra* note 5.

14. *See supra* pages 927–928.

to cite any evidence in the legislative and administrative records that would allow us to conclude that virtually all mining wastes and fly ash would, under EPA's approach, fall within section 101(14), or that this result would violate Congress' intent. Accordingly, EPA was, in our view, acting fully within its power when it construed as "hazardous substances" mining wastes and fly ash produced by the petitioners in this case.

### III

Our definitional inquiry does not end, however, with ascertaining the meaning of "hazardous substance" under CERCLA. For even if petitioners were to prevail on this branch of their argument, the further question would still be presented whether EPA could properly classify petitioners' mining wastes and fly ash as "pollutants or contaminants," and thereby render them eligible for inclusion on the NPL on that basis. Under section 105 of CERCLA, 42 U.S.C. § 9605, EPA is required to compile the NPL as a priority list of releases or threatened releases of "hazardous substances" *or* "pollutants or contaminants." A "pollutant or contaminant" is broadly defined in section 104(a)(2), 42 U.S.C. § 9604(a)(2); the term refers to, basically, any substance which may reasonably be anticipated to cause harm to the environment.[15] EPA is authorized to respond to the release or threatened release into the environment of a "pollutant or contaminant" that may present "an imminent and substantial danger to the public health or welfare," under section 104(a)(1), 42 U.S.C. § 9604(a)(1).

In its response to petitioners' comments in the rulemaking proceeding with respect to CERCLA's definitional reach, EPA stated that, while it was convinced that mining wastes constituted "hazardous substances" under the statute, the agency was even more persuaded that such wastes were "pollutants or contaminants"—a conclusion which would independently render mining sites eligible for inclusion on the NPL. 48 Fed.Reg. 40658, 40663 (1983). Unconvinced by EPA's reasoning, the mining waste petitioners maintain here that Congress intended entirely to exempt mining wastes from regulation under CERCLA through the exception contained in section 101(14). Arguing from this premise, petitioners urge that it would be illogical to conclude that Congress intended to allow this exception to be nullified by the "pollutant or contaminant" provision, which is designed to cover dangerous substances that have not been captured by the "hazardous substance" provision.[16] In essence, the mining waste petitioners fashion a variation of their recurring theme that EPA's interpretation would render meaningless the exception created by section 101(14)(C).

■ We have already concluded that the section 101(14)(C) exception applies only to that subparagraph, not to the other five subparagraphs; in consequence, the mining petitioners' argument obviously must fail here as well. Even assuming *arguendo*, however, that section 101(14)(C) totally ex-

---

**15.** For the purposes of this section, "pollutant or contaminant" shall include, but not be limited to, any element, substance, compound, or mixture, include disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. The term does not include petroleum, including crude oil and any fraction thereof which is not otherwise specifically listed or designated as hazardous substances under section 9601(14)(A) through (F) of this title, nor does it include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas).
42 U.S.C. § 9604(a)(2) (1982).

**16.** Petitioner Vepco parts company in this respect from its fellow petitioners. Vepco does not contend that fly ash cannot be a pollutant or contaminant, but only that it has not been shown to cause imminent and substantial danger. Vepco Reply Brief at 24–25. Vepco is joined in this respect by an intervenor, the Edison Electric Institute.

empted mining wastes from the coverage of "hazardous substances," we would not be persuaded that mining wastes cannot constitute "pollutants or contaminants." First, different consequences flow if a substance constitutes a "hazardous substance," as opposed to a "pollutant or contaminant." Under section 107, 42 U.S.C. § 9607, the owner of a facility may be liable for cleanup of a release of a "hazardous substance," but not for the cleanup of a release of a "pollutant or contaminant." Thus, it would in no wise be meaningless for a substance to be exempted from the former classification and yet fit within the latter.

Second, at the conclusion of the "pollutant or contaminant" definition set forth in section 104(a)(2), we find a familiar exclusion—for petroleum products—which is highly similar to the general exception set forth at the conclusion of the "hazardous substance" definition found, here as we have already seen, in section 101(14). If Congress were indeed of the view advanced by petitioners, namely that an exception in section 101(14) also exempted substances from the reach of section 104(a)(2), then surely it would have discerned no need tediously to set forth yet again a petroleum exception at the end of section 104(a)(2). To the contrary, the petroleum exception, under this view, would have been mere surplusage. We thus are constrained to conclude that a substance must be explicitly excluded from section 104(a)(2) in order to be exempted from the definition of "pollutant or contaminant." Inasmuch as no such exception for mining wastes is set forth, mining wastes can, in our view, indeed constitute "pollutants or contaminants" and thus trigger potential inclusion on the NPL.

 Moving to a second line of attack, the mining petitioners and Vepco argue that even if their wastes are "pollutants or contaminants," EPA cannot place their facilities on the NPL unless the agency first

determines that their respective sites could, under reasonably foreseeable circumstances, present "an imminent and substantial danger" to the public health and welfare. Petitioners' argument is premised on the fact that EPA is statutorily authorized under CERCLA to respond to a release or threatened release of a "pollutant or contaminant" only if the agency determines that the release may present "an imminent and substantial danger."

EPA is unmoved by this analysis. The agency suggests that all that may be needed to justify inclusion of a site on the NPL is "some minimum degree of confidence that the site may someday be eligible for Fund-financed remedial action." EPA Brief at 85. The agency points out that the NPL is not in itself remedial action—inclusion on the NPL requires no cleanup nor any other action by site owners.[17] Instead, the NPL is simply a rough list of priorities, assembled quickly and inexpensively to comply with Congress' mandate for the agency to take action straightaway. Utilizing the NPL, EPA will thereafter perform in-depth examinations of each site on the list to determine whether remedial action is necessary. If EPA determines at that later stage that the release of a "pollutant or contaminant" at a particular site does not present "an imminent and substantial danger," then no remedial action will be taken.

We find these arguments persuasive. The NPL is simply the first step in a process—nothing more, nothing less. EPA's position is strengthened, moreover, by the fact that section 105 of CERCLA, 42 U.S.C. § 9605, in requiring the President to fashion the national hazardous substance response plan (of which the NPL is a part), makes no mention whatever of "imminent and substantial danger"; instead, it provides that the President "shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." 42 U.S.C. § 9605 (1982). This omission strongly sug-

**17.** It is suggested that the owner of a facility at which a "hazardous substance" has been released *may* be liable for the costs of an EPA in-depth study of the site, even if that study ultimately concludes that no cleanup is required. *See* Joint Reply Brief of Petitioners at 4–5; *see also* 42 U.S.C. § 9107. Inasmuch as that issue is not presented by this case, we express no view on whether liability would in fact obtain in that situation.

gests that the element of "imminent and substantial danger" is not requisite to the threshold agency action of including a particular facility on the NPL.

Vepco, however, observes that section 105(8)(A) of CERCLA mandates that there be developed "criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action." 42 U.S.C. § 9605(8)(A) (1982). Once such criteria are developed, the utility continues, section 105(8)(B) then requires these criteria to be employed in assembling the NPL. Vepco argues that since the criteria for the list must be for the purpose of taking "remedial action," and since such action with respect to "pollutants or contaminants" can be taken only if there is a determination that the release presents an "imminent and substantial danger," EPA must therefore be persuaded that a reasonable possibility exists that such a determination will be made before a site can properly be placed on the NPL.

Upon analysis, we are unconvinced that the words "remedial action" found in section 105(8)(A) can carry the day for Vepco and its co-petitioners. Admittedly, the NPL is assembled by EPA with an eye toward future remedial action; nonetheless, we must keep firmly in mind the modest and limited purposes of the list. In our view, it is well within EPA's discretion to decide that, for a determination of "imminent and substantial danger" at a site to have any degree of reliability, that assessment would have to be based upon a more detailed, complex and thus rather expensive study all out of proportion to the limited, threshold-like goals of the NPL. It is, in our judgment, entirely reasonable for EPA to decide to await the results of in-depth examinations of specific sites before making a determination of "imminent and substantial danger." Thus, EPA could properly list petitioners' sites on the simple basis of those sites' containing "pollutants or contaminants."

## IV

■ Three petitioners, United Nuclear Corporation, Homestake Mining Company, and Cotter Corporation, own uranium mill tailing facilities; these petitioners champion an argument distinct from those of their fellow petitioners. Specifically, the uranium company petitioners object to EPA's listing facilities regulated by States pursuant to those States' agreements with the Nuclear Regulatory Commission ("NRC"), while at the same time excluding from regulation facilities directly regulated by the NRC under the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 et seq. (1982).

We pause to observe a few fundamental facts about the pertinent powers of the NRC. The NRC enjoys plenary authority to require cleanup of inactive uranium mill sites that it licenses. 42 U.S.C. § 2022 (1982). The NRC does not, however, license all such sites; instead, the NRC has authority to enter into agreements with individual States whereby those States license the sites within their respective jurisdictions. Id. § 2021. Employing the nomenclature used by the parties, we will refer to States which execute such agreements as "Agreement States." In its final promulgation of the NPL, EPA determined that sites licensed by the NRC should not be included on the NPL, because as we have just seen, "the NRC has full authority to require cleanup of releases from such facilities." 48 Fed.Reg. 40658, 40661 (1983). But with regard to sites regulated by Agreement States, EPA arrived at a contrary decision:

> When a facility is licensed by a State pursuant to an NRC delegation, the NRC has no authority, short of withdrawing the delegation itself, to enforce conditions of the license or determine that new conditions are necessary. EPA recognizes that the licensing State may be able to ensure cleanup of any release through the license, but has decided to list such sites on the NPL to provide potential Federal authorities if necessary.

Id. at 40662.

The uranium-company petitioners interpose three objections to EPA's determination in this respect. First, they claim that EPA has no authority under CERCLA to place on the NPL any facility regulated

**934**

either by the NRC or an Agreement State. Petitioners argue that CERCLA is designed to regulate only those sites that truly need response action by EPA, and that sites adequately regulated by the NRC or Agreement States cannot rationally be considered high priority candidates for CERCLA funds and response actions.[18] Joint Reply Brief of Petitioners at 25–26.

This argument is singularly unpersuasive. Congress specifically limited EPA's power under CERCLA to regulate certain radioactive releases. *See* 42 U.S.C. § 9601(22)(C).[19] Congress did not, however, choose specifically to exclude sites such as petitioners', nor did Congress place any other limitation on EPA's power to list sites regulated by other, nonfederal governmental entities. Except for specific limitations, EPA enjoys the power to list *any* site where there is a release or threatened release of a hazardous substance, pollutant or contaminant. We find nothing in CERCLA limiting EPA's authority to regulate mill tailings facilities.

Petitioners' second argument fares no better. They contend that EPA came forward with no rational explanation for its decision to exclude NRC-regulated facilities from the NPL, while at the same time including facilities regulated by Agreement States. Petitioners argue that NRC is not limited to withdrawing its entire delegation of authority to an Agreement State before it can respond, as EPA claims; instead, petitioners assert, the NRC is vested with power under sections 274(j)(1) and 274(j)(2)

of the Atomic Energy Act, 42 U.S.C. §§ 2021(j)(1), 2021(j)(2), to suspend all or part of a State's delegated authority and take over regulation of a site.

However, we do not read EPA's admittedly brief statement so strictly as to mean that NRC had to withdraw its entire delegation of authority to a State before the NRC could act. The fact is that the NRC must withdraw at least some of its delegation of authority before it can directly regulate an Agreement State facility. In our view, it was reasonable for EPA to decide that the NRC would encounter greater difficulty in withdrawing a delegation of authority and directly responding than would EPA in responding under CERCLA.

In its filings in this court, EPA more elaborately observes that the NRC cannot, in the case of an Agreement State site, always immediately take over regulation of that facility if state regulation is proving inadequate. In the event of an emergency, EPA maintains, the NRC can temporarily suspend its agreement with the State and take over regulation. 42 U.S.C. § 2021(j)(2). But in a non-emergency, the NRC can exercise such authority only after notice and hearing. *Id.* § 2021(j)(1). EPA argues that this procedure would be time-consuming and would thus delay initiation of remedial action. The back-up authority enjoyed by EPA under CERCLA would, in contrast, allow the federal government to act immediately, without the extreme step of revoking the agreement between a State and the NRC.

**18.** Interestingly, the State of New Mexico, an intervenor in this action, finds petitioners' profederalism arguments unappealing. Indeed, New Mexico argues for even broader environmental regulation, contending that, if EPA committed any reversible error, it was its decision *not to list NRC-regulated sites. See* New Mexico Brief at 25–26. We have no occasion to express and thus do not express an opinion on that issue.

**19.** The text of the pertinent part of 42 U.S.C. § 9601(22) is as follows:
"release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes . . . (C) release of source, byproduct, or special

nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. 2011 *et seq.*], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C. 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title. . . .
None of the releases in issue in this case are subject to the financial protection requirements of the NRC, nor have any of the sites in issue been designated under 42 U.S.C. § 7912(a)(1) or 42 U.S.C. § 7942(a).

Petitioners reply that EPA's latter-day explanation is entirely *post-hoc* and therefore will not do. They claim that EPA never articulated the non-emergency rationale until it was expounded in its brief. We disagree. This reasoning is readily deducible from EPA's statement set forth in the Federal Register. Although the NPL is designed to establish priorities for the removal of hazardous substances, as well as priorities for remedial action (actions consistent with a permanent remedy), *see* 42 U.S.C. §§ 9605(8)(A), 9605(8)(B), EPA has limited its discretion so that it can bring remedial actions only with respect to facilities identified on the NPL. 40 C.F.R. § 300.68 (1984). No such limitation obtains as to removal actions. If there were an emergency situation at a uranium mill tailings site, and immediate removal were required, EPA could take such action, regardless of whether the site was found on the NPL. *See* 40 C.F.R. § 300.65. Thus, we can properly assume that when EPA spoke of a need for placing a site on the NPL in order to provide federal back-up authority, the agency was necessarily referring to the authority to provide long-range, remedial actions for non-emergencies, since placement on the NPL is of little relevance to emergency action.

Petitioners also argue that EPA's rationale is inconsistent. If a situation is a non-emergency, they argue, then no immediate action is necessary, and the fact that the NRC will have to engage in notice and hearing procedures before it can act directly is irrelevant to the ultimate issue whether the public and environment are protected. Petitioners also complain that EPA has presented no data to show that the NRC has been unable in the past to insure adequate responses or that it will encounter delays in the future.

In response to petitioners' initial point, we simply observe the obvious—the fact

that a situation does not constitute an emergency by no means suggests that rapid response is not desirable. As for the latter argument, we do not believe EPA is obliged to come forward with evidence that the NRC cannot effectively respond to a particular kind of situation. EPA has drawn a perfectly reasonable inference that if notice, hearing, and a withdrawal of delegated authority are necessary before the NRC can act, then it is entirely possible that federal action in such instances could be delayed and that any such delay needlessly could result in environmental damage. We can discern nothing inappropriate in EPA's deciding to be ready to act just in case such a delay occurs.

Finally, petitioners argue that no federal back-up is needed for the simple reason that the Agreement States are fully capable of protecting the environment. EPA's view, they claim, is "in direct conflict with the purposes of the Atomic Energy Act to strengthen and preserve state authority" and reflects "a cynical distrust of the capability or intention of agreement state licensing authorities to address adequately concerns of public health that may arise from the facilities they license." Joint Brief for Petitioners at 50. We are unable to agree that EPA's readiness to step in just in case Agreement States have difficulty in effecting cleanup is destructive of federalism concerns embodied in the Atomic Energy Act. Indeed, the only Agreement State to intervene in this action— New Mexico—has strenuously argued that EPA's authority to list sites in Agreement States must be upheld. If the Agreement States themselves have no federalism-grounded objection, we are hard pressed to find one.[20]

## V

For the foregoing reasons, the petitions for review, as to the issues addressed herein, are denied.

---

20. We recognize that the State of Colorado wrote EPA indicating that Colorado did not wish the Cotter Corporation site to be placed on the NPL. *See* Attachments to Joint Reply Brief of Petitioners. Colorado did not, however, express the view that EPA was wanting in power

to regulate that site. Rather, Colorado authorities seemed to be of the view that the regulations under which Cotter operated provided sufficient protection to the environment. Colorado, unlike New Mexico, did not intervene in this case.