The STATE OF IDAHO, Plaintiff,

v.

The BUNKER HILL COMPANY, a Delaware corporation; Pintlar Corporation, a Delaware corporation; Gulf Resources & Chemical Corporation, a Delaware corporation; and John Does 1 to 500, Defendants.

GULF RESOURCES & CHEMICAL CORPORATION, Third-Party Plaintiff,

v.

The AETNA CASUALTY AND SURETY COMPANY and The Home Indemnity Company, Third-Party Defendants.

GULF RESOURCES & CHEMICAL CORPORATION, and Pintlar Corpoation, Third-Party Plaintiffs,

v.

The FIDELITY AND CASUALTY COMPANY OF NEW YORK; Pacific Insurance Company; Continental Re-Insurance Corporation; First State Insurance Company; Northwestern National Insurance Company, Northwestern National Casualty Company; Admiral Insurance Company; The Insurance Company of the State of Pennsylvania; and Pacific Indemnity Company (Chubb), Third-Party Defendants.

PINTLAR CORPORATION, Third-Party Plaintiff,

v.

UNDERWRITERS AT LLOYD'S, LONDON, Third-Party Defendant.

AETNA CASUALTY AND SURETY COMPANY, Third-Party Plaintiff,

v.

FIRST STATE INSURANCE COMPANY, Northwestern National Insurance Company, and Northwestern National Casualty Company, Third-Party Defendants.

---

CONTINENTAL RE-INSURANCE COR-
PORATION, a California corporation;
Pacific Insurance Company, a Califor-
nia corporation; and Fidelity & Casu-
alty Company of New York, a New
York corporation, Third-Party Plain-
tiffs,

v.

FIRST STATE INSURANCE COMPANY,
Northwestern National Insurance Com-
pany, and Northwestern National Casu-
alty Company, Third-Party Defendants.

PINTLAR CORPORATION,
Third-Party Plaintiff,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Third-Party Defendant.

AETNA CASUALTY & SURETY CO., a
corporation, Plaintiff,

v.

GULF RESOURCES & CHEMICAL COR-
PORATION, a Delaware corporation;
The Bunker Hill Company, a Delaware
corporation; Pintlar Corporation, a
Delaware corporation, Defendants.

CONTINENTAL RE-INSURANCE COR-
PORATION, a California corporation;
Pacific Insurance Company, a Califor-
nia corporation; Fidelity & Casualty
Company of New York, a New York
corporation; and Northbrook Insur-
ance Company, an Illinois corporation,
Plaintiffs,

v.

The BUNKER HILL COMPANY, a Del-
aware corporation; and Gulf Resources
& Chemical Corporation, a Delaware
corporation, Defendants.

Nos. 83–3161, 84–1155 and 84–3071.

United States District Court,
D. Idaho.

May 22, 1986.

Jim Jones, Atty. Gen., State of Idaho, P. Mark Thompson, Deputy Atty. Gen., Chief, Administrative Law & Litigation Div., Boise, Idaho, Sheila Glusco Bush, Deputy Atty. Gen., Administrative Law & Litigation Div., for State of Idaho.

William F. Boyd, Fred M. Gibler, Charles L.A. Cox, Evans, Keane, Koontz, Boyd & Ripley, Kellogg, Idaho, James P. Keane, Evans, Keane, Koontz, Boyd & Ripley, Co-

eur d'Alene, Idaho, for Bunker Hill, Pintlar Corp., Gulf Resources & Chemical Corp.

R.B. Kading, Jr., Scott D. Hess, Warren Jones, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, Idaho, for Pacific Idem. Co., Aetna Cas. and Sur. Co.

R.B. Rock, Robert B. Luce, Kristi Emig-Mark, Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, for Home Idem. Co.

John P. Howard, Marc A. Lyons, Quane, Smith, Howard & Hull, Boise, Idaho, for Fidelity & Cas. Co. of New York, Pacific Ins. Co., Continental Re-Ins. Corp., Northbrook Ins. Co.

Richard C. Mellon, Jr., D. Alan Kofoed, Elam, Burke & Boyd, Boise, Idaho, for First State Ins., Northwestern Nat. Ins., Northwestern Nat. Cas.

Howard Humphrey, Clemons, Cosho & Humphrey, Boise, Idaho, Frank R. Morrison, Jr., Bassett & Morrison, Seattle, Wash., for The Ins. Co. of the State of Pa.

James B. Lynch, Scott W. Marotz, Charles R. Clark, Imhoff & Lynch, Boise, Idaho, for Admiral Ins. Co.

James P. Barber, Ray L. Wong, William J. Casey, Hancock, Rothert & Bunshoft, San Francisco, Cal. Gardner W. Skinner, Jr., Robert D. Lewis, Cantrill, Skinner, Sullivan & King, Boise, Idaho, for Underwriters at Lloyd's, London-Jervois.

## MEMORANDUM OPINION AND ORDER

RYAN, District Judge.

### I. INTRODUCTION

May 9, 1986, the court heard oral argument on issues raised pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9657 (1984), as well as the issue of personal jurisdiction over Gulf Resources & Chemical Corporation (Gulf). All parties were represented by respective counsel at the hearing on the CERCLA issues. The court hereby enters its opinion on the personal jurisdiction issue and the

issues raised pursuant to the CERCLA statute.

## II. ISSUE ANALYSIS

### A. *Personal Jurisdiction*

■ Under the personal jurisdiction analysis set out in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny, the court must analyze the contacts of the nonresident defendant with the forum in order to satisfy a conclusion that the contacts of the nonresident defendant with the forum warrant subjecting that defendant to the forum court's jurisdiction. The court must find that in relying upon the established contacts, traditional notions of fair play and substantial justice would not be offended by subjecting the nonresident defendant to the forum court's jurisdiction.

The Idaho Legislature has adopted a long-arm jurisdiction statute, Idaho Code § 5–514 (1979). The Idaho long-arm statute, as it relates to this case, recognizes personal jurisdiction over a nonresident defendant where it can be said that the defendant is doing business in the state or has committed a tortious act within the state. *Id.* Rule 4(c)(2)(C) of the Federal Rules of Civil Procedure allows service in a federal action as authorized by state law.

It is undisputed that when a subsidiary of a foreign corporation is carrying on business in the forum state, the parent is not automatically subjected to jurisdiction in the state. If the subsidiary is carrying on its own business and the corporate formalities have been observed, personal jurisdiction may not be acquired over the parent solely on the basis of the local activities of the subsidiary. *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Idaho Potato Commission and the State of Idaho v. Washington Potato Commission*, 410 F.Supp. 171 (D.Idaho 1975). Gulf is the parent company of Bunker Hill Company. Gulf and Bunker Hill merged in May 1968 and Bunker Hill became the wholly owned subsidiary of Gulf. Bunker Hill later changed its name to Pintlar Corpora-

tion. Under traditional personal jurisdiction analysis, the question then is whether the activities of Gulf with respect to its subsidiary and further contacts with the State of Idaho warrant a finding of personal jurisdiction.

■ The affidavits and documents submitted by the State establish that during the years 1968 through 1982, Gulf and Bunker Hill were so intertwined, and Gulf so controlled the management and operations of Bunker Hill, that subjecting Gulf to this court's jurisdiction would neither offend due process considerations nor traditional notions of fair play and substantial justice. The court has considered all of the evidence in the record in making this determination. Significant to the court's decision, however, are the following: Gulf at times controlled a majority of Bunker Hill's board of directors; in matters dealing with pollution problems, Bunker Hill was not allowed to spend more than Five Hundred Dollars ($500) without approval of Gulf; Bunker Hill's authorized capital was a mere Eleven Hundred Dollars ($1100) while Gulf received Twenty-seven Million Dollars ($27,000,000) in dividends from Bunker Hill between 1968 and 1974; Bunker Hill's federal tax returns were consolidated with Gulf's; all capital expenditures were to be approved by Gulf; and Gulf could overrule a transaction or decision regarding management made by Bunker Hill. Gulf's activities with respect to Bunker Hill, its control of management and operations and its overall contacts with this State render it personally subject to the jurisdiction of this court.

This court found personal jurisdiction over Gulf in *Prindiville v. Gulf Resources*, Civil No. 81–2086 (D.Idaho September 21, 1982). The State asserts that Gulf is now estopped to deny personal jurisdiction in Idaho. Offensive use of collateral estoppel has been approved by the United States Supreme Court. *Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of*

*Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Essentially, the court must find that the issue was necessarily decided in the prior action, the parties to the current action were parties or privy to the first action, and that the interests of fairness will be served by holding the issue estopped in the current action.

■ *Prindiville* dealt with personal injury due to the pollution caused by Bunker Hill and Gulf. Gulf is the interested party in both actions. While *Prindiville* was a personal injury action, it arose out of the same activities of Gulf as are challenged in this action. It would not, therefore, be unfair to estop Gulf from denying that this court has personal jurisdiction over it, as decided in *Prindiville.* As an alternative to this court's finding that personal jurisdiction exists over Gulf under a traditional analysis, Gulf is estopped to deny personal jurisdiction in this instance.

### B. *"Owner or Operator"*

CERCLA Section 107(a)(1) and (2) confer liability upon the following parties:

> (1) the owner or operator of a vessel ... or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of....

The phrase "owner or operator" is defined in Section 101(20)(A) as follows:

> "owner or operator" means ... (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any abandoned facility, any person who owned, operated, or otherwise controlled activities at such facility immediately prior to such abandonment.

It is admitted that Gulf does not currently own or operate the Bunker Hill facility. The State asserts that Gulf is an owner or operator under Section 107(a)(2) since it was so at the time of disposal of hazardous substances.

■ Gulf's first contention is that the definition of owner or operator in Section 101(20)(A)(iii) limits past owner liability to the case where the facility has been abandoned. Gulf's assertion is erroneous. Certainly, Congress did not intend to exempt all past owners or operators from liability for hazardous waste releases except those who abandoned their facilities. Regardless of the definition of owner or operator in Section 101(20)(A)(iii), the plain language of Section 107(a)(2) includes as potentially liable those past owners and operators who were such at the time of disposal of hazardous substances. Congress did not intend a restrictive reading of CERCLA. In any event, it is arguable that the facility has been "abandoned" with respect to the defendants herein. In *United States v. Waste Industries,* 556 F.Supp. 1301, 1304 n. 5 (E.D.N.C.1982), the court stated that: "A dump site has been abandoned when its owners and operators no longer maintain a relationship with it." In that case, the facility had been closed and later sold.

Gulf contends that the facility in question was owned and operated by Bunker Hill, and not Gulf. The parties have argued this issue in much the same fashion as the personal jurisdiction issue discussed above. Specifically, the State has argued that an activity/contacts analysis results in a finding that Gulf was the de facto operator of the facility, if not the owner. The court agrees that the analysis with respect to Gulf's involvement in the management and operations of Bunker Hill discussed under the personal jurisdiction issue support a conclusion that Gulf was an owner or operator for purposes of CERCLA liability.

■ However, a more precise definition of owner or operator may be available. In *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823 (W.D.Mo.1984), the court adopted the following test and reasoning in holding a vice-president and major stockholder of the defendant corporation liable as an owner or operator:

> The statute literally reads that a person who owns interest in a facility and is actively participating in its management

can be held liable for the disposal of hazardous waste. Such a construction appears to be supported by the intent of Congress. CERCLA promotes the timely cleanup of inactive hazardous waste sites. It was designed to insure, so far as possible, that the parties responsible for the creation of hazardous waste sites be liable for the response costs in cleaning them up. Congress has determined that the persons who bore the fruits of hazardous waste disposal also bear the costs of cleaning it up. The Eighth Circuit adopted the definition given "owner or operator", 33 U.S.C. § 1321(a)(6), by the Fifth Circuit in *United States v. Mobil Oil Corporation*, 464 F.2d 1124, 1127 (5th Cir.1972):

> The owner-operator of a vessel or a vacility [sic] has the capacity to make timely discovery of oil discharges. The owner-operator has power to direct the activities of persons who control the mechanisms causing the pollution. The owner-operator has the capacity to prevent and abate damage. Accordingly, the owner-operator of a facility governed by the WPCA, such as the Mobil facility here, must be regarded as a "person in charge" of the facility for the purposes of § 1161. A more restrictive interpretation would frustrate congressional purpose by exempting from the operation of the Act a large class of persons who are uniquely qualified to assume the burden imposed by it.

*Id.* at 848–49 (quoting *Apex Oil Co. v. United States*, 530 F.2d 1291, 1293 (8th Cir.1976)) (emphasis in original) (footnotes omitted). The court believes that the test outlined above may properly be employed to determine when a parent corporation becomes an owner or operator with respect to a subsidiary's facilities.

█ Defendant Gulf was in a position to be, and was, intimately familiar with hazardous waste disposal and releases at the Bunker Hill facility; had the capacity to control such disposal and releases; and had the capacity, if not total reserved authority, to make decisions and implement actions and mechanisms to prevent and abate the damage caused by the disposal and releases of hazardous wastes at the facility. As noted previously in this opinion, approval from Gulf was necessary before more than Five Hundred Dollars ($500) could be spent on pollution matters and before capital expenditures could be made. Gulf at times controlled a majority of Bunker Hill's board of directors and Gulf obtained weekly reports of day-to-day aspects of Bunker Hill operations. With respect to Congress's intent that those who bore the fruits must also bear the burdens of hazardous waste disposal, it must be noted that Bunker Hill's authorized capital was a mere Eleven Hundred Dollars ($1100) while Gulf received Twenty-seven Million Dollars ($27,000,000) in dividends from Bunker Hill. Gulf fully owned Bunker Hill.

The court finds that the evidence presented is sufficient to impose liability on Gulf as an owner or operator for purposes of Section 107(a)(2), 42 U.S.C. § 9607(a)(2). The court is mindful that in adopting the above test, care must be taken so that "normal" activities of a parent with respect to its subsidiary do not automatically warrant finding the parent an owner or operator. To hold otherwise in the instant action, however, would allow the corporate veil to frustrate congressional purpose. Gulf is, in this case, an owner or operator for purposes of CERCLA liability.

### C. *Response Costs*

At oral argument in this matter, the parties stipulated that the plaintiff's claim for response costs should be dismissed without prejudice. It is so ordered.

### D. *Mining Waste as a Hazardous Substance Under CERCLA*

█ Section 101(14) of the CERCLA statute defines hazardous substances for purposes of assessing liability pursuant to Section 107(a). Hazardous substance is defined in Section 101(14) as follows:

> "[H]azardous substance" means (A) any substance designated pursuant to section

311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas);

The defendants argue that Section 101(14)(C) excludes mining wastes from CERCLA coverage. The regulation of mining wastes has been suspended under the Solid Waste Disposal Act.

The courts addressing the issue have held that a substance may be considered a hazardous substance under the Act if it falls within any of the six subsections found in CERCLA Section 101(14). *Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 922, 927 (D.C.1985); *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143 (D.Ariz.1984). It is undisputed that the mining wastes at issue in this case consist of and contain substances listed under sections other than Section 101(14)(C). The cases have uniformly held that mining wastes are included under CERCLA. *Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 922, 927 (D.C.1985); *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143 (D.Ariz.1984); *United States v. Union Gas Co.,* 586 F.Supp. 1522 (E.D.Pa.1984). Further, the Environmental Protection Agency's administrative interpretation of CERCLA includes mining wastes. The agency stated, "the agency believes that mining wastes can be considered hazardous substances under CERCLA if it meets any of the other statutory criteria." Amendment to National Oil and Hazardous Substance Contingency Plan, 48 Fed.Reg. 40,658–663 (1983). The court finds the legislative history to be inconclusive on this point as the Senate Report to Senate Bill 1480 and the floor debates regarding the statute enactment are conflicting.

The court is persuaded that the statutory language, the case law, and the EPA's administrative interpretation all support a conclusion that mining wastes are subject to coverage under the CERCLA statute.

### E. *Permitted Releases*

The defendants have requested that summary judgment be entered holding that the defendants are not liable for any natural resources damages resulting from releases in compliance with federal permits. CERCLA Section 101(10) defines "federally permitted releases." The State cannot, and does not, seek recovery under the CERCLA statute for releases in compliance with federal permits. Section 107(j) of CERCLA provides that recovery for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of the CERCLA statute. It is clear from the statute that resort must be made to state common law in order to recover for any damages resulting from permitted releases. The State has asserted a nuisance claim, under the common law, in order to recover for damages resulting from the permitted releases.

■ The court finds that to the extent damage was caused by releases which were not expressly permitted in the various permits, which exceeded the limitations established by the permits or which occurred during a time period when there were no permits, then the State may seek recovery for those damages under the CERCLA statute. The documents on file show that substantial factual issues exist regarding the existence of permits, the scope of those permits, the extent of releases which exceeded the limitations of the permits, and the extent of damage which occurred as a result of unpermitted releases. Summary judgment, therefore, is inappropriate.

### F. *Natural Resource Damages*

CERCLA Section 107(f) provides: "There shall be no recovery under the authority of subparagraph (C) of subsection (a) where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before" the date of enactment (December 11, 1980). Subparagraph (C) provides: "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

The State seeks recovery for natural resource damages which have occurred from the operations of the Bunker Hill facility over the past century. The question addressed under this issue involves a construction of Section 107(f). The State has argued that continuing damage is outside the bar of Section 107(f) as the damage has not "occurred wholly before" the date of enactment of CERCLA statute. In other words, the State claims that if the natural resources in the area have been damaged, at any time during which the defendants have operated in the area over the past century, and that the natural resources remain in that damaged state unabated, then the Section 107(f) bar is not applicable since the damage has not occurred wholly before enactment of the statute. The defendants have argued that the more reasonable interpretation of the statute is that if the

release and resultant damage occurred wholly before enactment, then recovery is barred. If the release occurred prior to enactment with damage resulting post-enactment, then Section 107(f) is not a bar to relief. Finally, obviously, if both the release and the damage occur post-enactment, then Section 107(f) is inapplicable.

■ The plain language of Section 107(f) states that if both the release *and* the resulting damage occur prior to enactment of the statute, there is no recovery for natural resource damages. Damage to the environment (whether or not abated) which occurred prior to enactment must have been preceded by a release and, therefore, wholly before enactment. Where the State's analysis goes astray is rooted in its misconception of the role of causation under the CERCLA statute. The plaintiff has argued that since there is admittedly strict liability under the statute, there is no need for causation. However, strict liability does not abrogate the necessity of showing causation, but merely displaces any necessity for showing some degree of culpability by the actor. In other words, under strict liability the mental state of the defendant is irrelevant, but the damage for which recovery is sought must still be causally linked to the act of the defendant. The House Report clearly indicates that principles of causation apply to actions under the CERCLA statute. H.R.Rep. No. 96–1016 (part I) 96th Cong., 2d Sess. 33–34 (1980), U.S.Code Cong. & Admin.News 1980, p. 6119. The Senate Report is in accord. S.Rep. No. 1480, 96th Cong., 2d Sess. 4(a) (1980). Also, the use in Section 107(f) of the word "resulted" ties the damages to the releases. The proof must include a causal link between releases and post-enactment damages which flowed therefrom.

The Senate Report to Senate Bill 1480, which was the Senate version of the CERCLA statute, states that, "[t]his provision allows for recovery only of prospective natural resource and property damages." S.Rep. No. 96–848, 96th Cong., 2d Sess. 37 (1980). Further, the court in *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300

(N.D.Ohio 1983), commented: "Finally, the § 9607(f) prohibition on recovery for injuries to natural resources occurring before CERCLA's enactment suggests, by implication, that a similar prohibition does not apply to other response costs." *Id.* at 1311. *See also United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823 (W.D.Mo. 1984). In *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn. 1982), the court found:

> Under section 107(f) Reilly Tar may escape liability for natural resource damages only where both the damages and the release occurred *wholly* before December 11, 1980. *Id.* Section 107(f) precludes liability under section 107(a)(4)(C) only where (1) all releases ended before December 11, 1980, and (2) no damages were suffered on or after December 11, 1980 as a result of the release. The complaint alleges continuing releases and damages from the release. The extent to which Reilly Tar will be entitled to escape liability under section 107(f) is a fact question to be resolved in future proceedings.

*Id.* at 1120 (emphasis in original). *See United States v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo.1985).

 All courts which have addressed the issue have determined that the clear intention of the CERCLA statute is to impose liability upon past owners and operators. *United States v. Conservation Chemical Co.,* 589 F.Supp. 59 (W.D.Mo. 1984); *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823 (W.D.Mo.1984); *United States v. Price,* 577 F.Supp. 1103 (D.N.J. 1983); *United States ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983). Therefore, damages which have occurred post-enactment are actionable and recoverable, even though they are the result of pre-enactment releases, as defendants have admitted.

In sum, to the extent that both the release and the resultant damage occurred prior to enactment, Section 107(f) bars recovery. To the extent that both the release and the resultant damage occurred post-enactment, there is no bar to recovery. To the extent the release occurred prior to enactment, but the resultant damage occurred post-enactment, Section 107(f) does not bar recovery. At oral argument the parties heavily debated burdens of proof. The court makes no finding herein as to burdens of proof and will therefore leave the issue for another day.

### G. *Aesthetic and Economic Damages*

 CERCLA Section 107(a)(4)(C) provides recovery for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." Section 107(f) provides, in part, that sums recovered shall be used to restore, rehabilitate, or acquire the equivalent of the damaged natural resources, "but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources."

The CERCLA statute does not provide explicit guidelines in measuring natural resource damages for purposes of fixing a dollar value for recovery. The defendants contend that the measure of recovery for injury, damage or loss to natural resources is the cost of assessing the damage and the cost of restoration or rehabilitation. On the other hand, the plaintiff contends that a value-based measure of recovery is appropriate. Under the plaintiff's value concept, the value of the natural resources as they existed prior to the damage (considering all uses, aesthetic value and economic value) would be subtracted by the value of the natural resources as they exist after the damage or injury has occurred, the difference between the two values being the measure of recovery.

The most enlightening legislative history regarding the proper measure of natural resource damages is found in a colloquy between Senators Stafford and Simpson during a Senate debate. In essence, Senator Simpson was attempting to give some

guidance as to how the measure of damages should be calculated. He noted that methods of measuring resource damages are in the stage of early development. However, he suggested that traditional tort rules for calculating damages should be observed as appropriate. He commented by way of example that the law awards the difference in value before and after the injury in some cases and where the injury can be restored to its original condition for less than the difference in value, the cost of restoration is the appropriate measure. 126 Cong.Rec. S1500 (daily ed. Nov. 24, 1980). The senator recognized both measures of recovery proposed by the defendant and the plaintiff. Damages to the natural resources may be calculated on a value basis and on a cost-of-restoration basis. The calculation which provides the least recovery in terms of dollars is the appropriate measure of damages.

### H. *Gulf and Pintlar's Liability Outside 1968 through 1982*

Gulf has argued that it cannot be liable for damage, which may be recoverable by the State, which has resulted from hazardous waste disposal prior to May 28, 1968. Gulf purchased Bunker Hill on May 28, 1968. In 1982, the name "Bunker Hill" was changed to "Pintlar," and thereafter the facility was sold to Bunker Limited Partnership. As noted previously under the "owner/operator" analysis, Section 107(a)(2) provides for liability for any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. Certainly, Gulf was not and could not be considered an owner or operator prior to May 28, 1968. Nothing in the record reflects that Gulf had anything to do with the Bunker Hill site prior to that time. While the acts of the Bunker Hill Co. prior to 1968 may be in question, Gulf cannot be held liable for such acts.

■ Pintlar has claimed that it cannot be liable for damages incurred after 1982. This issue has been addressed above with respect to the natural resources damages. To the extent that damage continues to occur from waste discharges occurring while Pintlar (formerly Bunker Hill), as well as Gulf, was an owner/operator, it continues to be liable. Therefore, Pintlar and Gulf may be liable for damages which have occurred after 1982. To the extent that damaging releases have occurred after the sale to Bunker Limited Partnership in 1982, which are not attributable to acts of Pintlar/Gulf, they are not liable for such damage.

### I. *Joint and Several Liability (Indispensible Parties)*

■ The question has been raised whether CERCLA imposes joint and several liability or merely several liability. The courts which have addressed this issue have found that joint and several liability is not precluded nor mandated by CERCLA. The scope of liability in terms of whether it is joint and several is to be determined under common law principles, wherein the court performs a case-by-case evaluation of the complex factual scenarios associated with multiple generator waste sites in order to assess the propriety of applying joint and several liability on an individual basis. *United States v. Chem-Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983); *United States v. A & F Materials Company, Inc.*, 578 F.Supp. 1249 (S.D.Ill.1984); *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.*, 579 F.Supp. 823 (W.D.Mo.1984).

■ Under the common law rule, when two or more persons acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm. Restatement (Second) of Torts §§ 433A, 881, 875 (1976); W. Prosser, *Law of Torts* (4th ed.) (1971); *Edmonds v. Compagnie Generale Transatlantique*, 443

U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979). Further, where the conduct of two or more persons or entities, liable under CERCLA Section 107, have combined to violate the statute, and one or more of the defendants seeks to limit his liability on the ground that the entire harm is capable of apportionment, the burden of proof as to apportionment is upon the defendant. *United States v. Chem-Dyne Corp.*, 572 F.Supp. at 810; Restatement (Second) of Torts § 433B (1976). However, it has been noted that care must be taken by the courts in imposing joint and several liability upon what may be a relatively small contributor to the waste site because of the inherent unfairness. *United States v. A & F Materials Company, Inc.*, 578 F.Supp. at 1256.

■ The court finds that, at this stage, there are substantial questions of fact regarding the divisibility of the damage and the existence of other potentially liable parties which preclude decision of this issue on summary judgment.

■ The defendants have moved for dismissal pursuant to Rule 12(b) of the Federal Rules of Civil Procedure for failure to add indispensible parties. In *United States v. A & F Materials Company, Inc.*, the court addressed a motion for dismissal for failure to add indispensible parties within the meaning of Rule 19, Federal Rules of Civil Procedure. The court noted that the argument was directly related to the joint and several liability issue. The court stated that if it decided to impose joint and several liability, it is well settled that the plaintiff may choose between joint tort-feasors when bringing an action. Further, even if joint and several liability were not imposed, then, of necessity, there will have been a finding of divisibility and the defendant will only be held liable for the injury which is divisible and capable of apportionment and will not run the risk of multiple liability. The court found the argument untenable in all respects. *Id.* at 1260–61. This court hereby adopts the *A & F Materials* court's reasoning.

### J. Nuisance

■ This court, in its Order dated January 15, 1985, ruled that the four-year statute of limitations contained in Idaho Code § 5–224 is applicable to the State's nuisance claim and that no such claim may be made for any damage occurring prior to December 11, 1979. The defendants have argued that it is undisputed that there has been no injury to the environment from 1979 to the date of the filing of the Complaint, December 11, 1983. The State has submitted affidavits and documents which suggest that damage to the environment continues, even though there has been an overall improvement in the environmental outlook for the area. Summary judgment is, therefore, inappropriate.

■ The defendants have also argued that the Idaho Environmental Protection Act preempts plaintiff's common law action for nuisance. The Idaho Environmental Protection and Health Act of 1972 (EPHA), Idaho Code §§ 39–101–114, established a comprehensive regulatory program regarding environmental pollution. The Act established a board and director which were given power to formulate and recommend rules, regulations and codes dealing with, inter alia, various forms of pollution. The director is given power to promote adoption of regulations, standards and codes, and is given the power to bring suit under the statute.

The EPHA provides that, "[i]n addition to such civil penalties [provided by the EPHA], any person who violates this act shall be liable for any expense incurred by the state ... in enforcing or terminating any nuisance, source of environmental degradation, cause of sickness, or health hazard." Idaho Code § 39–108(7). It appears that the Act expressly recognizes nuisance claims. If the legislature has intended to preempt the State's nuisance claim, it must clearly appear from the Act or other indicia of legislative intent; none has been cited and the court has found no express legislative intent to preempt. The Act establishes a board and director to implement policies

and programs for abatement of various environmental problems and is simply another method for the State to address environmental concerns. The Idaho Environmental Protection Act does not preempt the State's common law nuisance claims.

### III. ORDER

The issues discussed in this opinion were raised in defendants' Motion for Summary Judgment filed April 9, 1985; Aetna's Motion to Dismiss or, in the Alternative, for Summary Judgment filed June 4, 1985; Aetna's (second) Motion to Dismiss or, in the Alternative, for Summary Judgment filed June 4, 1985; Admiral's Motion to Dismiss or, in the Alternative, for Summary Judgment filed July 2, 1985; and Jervois Underwriters' Motion to Dismiss or, in the Alternative, for Summary Judgment filed April 18, 1986. The above motions shall be considered decided consistent with this opinion.

IT IS SO ORDERED.