UNITED STATES of America, Plaintiff,

Dennis H. Treacy, Acting Director, Virginia Dept. of Environmental Quality, Virginia Waste Management Board, Intervenors,

v.

HIGH POINT CHEMICAL CORP., Clarence A. Hustrulid, et al., Defendants.

Civil Action No. 97–147–C.

United States District Court, W.D. Virginia, Charlottesville Division.

May 26, 1998.

John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, for U.S.

Stewart T. Leeth, Office of Attorney General, Richmond, VA, for Thomas L. Hopkins, Virginia Waste Management Board.

Stuart Frederick Carwile, Wiley & Rein, Washington, DC, Susan D. Sawtelle, N. Christopher Hardee, Wiley, Rein & Fielding, Washington, DC, James F. Burnett, Potter, Anderson & Corroon, Wilmington, DE, for High Point Chemical, Clarence Hustrulid.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Before the court are defendant High Point Chemical Corporation's ("High Point") March 9, 1998 Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, High Point's March 9, 1998 Motion to Transfer Venue to the Middle District of North Carolina, defendant Clarence Hustrulid's ("Hustrulid") March 9, 1998 Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and Hustrulid's March 9, 1998 Motion to Transfer Venue to the Middle District of North Carolina. Additionally, the court is in receipt of the plaintiff's and the intervenors' memoranda in reply to the motions. The court heard argument on the motions at a hearing on May 7, 1998. For the reasons stated more fully below, the court will deny the motions at issue.

## I.

### A. Procedural Background

On December 8, 1997, the United States brought an action against the four defendants, High Point, Hustrulid, Greenwood Chemical Corporation ("Greenwood"), and Albert Cereghino ("Cereghino"), under Sections 107 and 113(b) of the Comprehensive Environmental, Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607 and 9613(b).

The United States alleges that it is entitled to recover more than $22 million in cleanup response costs[1] expended by the Federal government to remove certain environmentally hazardous materials[2] from the Greenwood Site ("Site") in western Albemarle County, Virginia. Complaint ¶ 1; COUNT I. The U.S. also seeks a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against the defendants holding them liable in future actions for further costs incurred in relation to the Site. Complaint ¶ 1; COUNT IV. Finally, the government seeks certain penalties from High Point Chemical pursuant to Section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1), arising from High Point's alleged failure to comply with a Unilateral Administrative Order issued by the Environmental Protection Agency ("EPA") on June 30, 1994. Complaint ¶¶ 50-52; COUNT II. Such penalties include punitive damages under Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Complaint ¶ 3; COUNT III.

### B. Factual Background

This matter comes before the court on defendants' motion to dismiss. For purposes

---

1. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides for the joint and several liability of owners or operators of Superfund Sites for cleanup response costs. *See, e.g., United States v. Monsanto Co.,* 858 F.2d 160, 171 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

2. The following is alleged by the government. For almost forty years, Greenwood and its predecessors in interest made industrial, agricultural, pharmaceutical, and photographic chemical products at the Site. Those manufacturing processes involved the use of sulfuric acid, benzene, toluene, cyanide, napthalene, acetic acids, and arsenic. More than twelve hundred (1200) drums containing hazardous substances were buried at the Site. Waste water was discharged into unlined pits and lagoons at the Site, as well. Complaint ¶¶ 22-25.

of a Fed.R.Civ.P. 12(b)(6) motion, *all* factual allegations in a plaintiff's complaint must be accepted as true by a district court. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217–18 (4th Cir.1994) (emphasis added).

In 1947, Frank Cockerille began operating Carstairs Chemical Company (later Cockerille Chemicals) at the present Greenwood Chemical Site. Complaint ¶ 10. On November 30, 1968, a new company named Greenwood Chemical Corp. formed. Complaint ¶ 11. On that date in 1968, Mr. Hustrulid owned twenty-five percent (25%) of the shares of Greenwood and was the President and Treasurer of the company. Complaint ¶ 12. Between November 30, 1968 and October 27, 1975, Hustrulid, a Lester Stevens, and Stevens' family owned between sixty and seventy percent (60–70%) of the shares of Greenwood. Complaint ¶ 13. Hustrulid continued to serve as President and Treasurer of Greenwood until October 20, 1975. During this same period, Hustrulid and the Stevenses also owned more than ninety percent (90%) of the shares of High Point, a North Carolina chemical manufacturing company. Complaint ¶ 14. On January 1, 1969, Greenwood purchased all of Cockerille Chemicals' property. Complaint ¶ 15.

In controversy is whether, under the governing provisions of CERCLA and of the Federal Rules, the United States has pleaded sufficient facts which, assuming them to be true, could subject High Point and Hustrulid to liability as "operators"[3] of the Greenwood Site. In the main, the motions to dismiss directly implicate only COUNT I of the government's Complaint. Of course, the motion to dismiss and the motion to transfer would reach all counts against High Point and Hustrulid in the Complaint, were either to be granted.

## II.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure "failure to state a claim upon which relief can be granted" provides grounds for dismissal. Again, for purposes of a Fed.R.Civ.P. 12(b)(6) motion, all factual allegations in a plaintiff's complaint must be accepted as true by a district court. *Estate Constr. Co., supra*, 14 F.3d at 217–18.[4] A plaintiff's Complaint ought not be dismissed unless it is apparent that the plaintiff "would not be entitled to relief under *any* facts which could be proved in support of [its] claim." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991) (emphasis added); *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). For these reasons, Rule 12(b)(6) dismissals generally are disfavored. *Id.*

## III.

Here, the United States pleads the following facts based on which it asserts that High and Hustrulid were "operators" of the Greenwood Site. To quote the Complaint:

16. Between November 30, 1968, and October 20, 1975, High Point was actively involved in day-to-day operations at Greenwood. For example:

A. Employees of High Point who were paid salaries by High Point, but were not paid salaries by Greenwood, regularly performed work for Greenwood, including but not limited to, developing formulations for products manufactured by Greenwood, signing checks on behalf of Greenwood, and performing maintenance work at Greenwood.

B. High Point ordered and paid for products that were delivered to Greenwood.

C. High Point gave equipment to Greenwood without requiring Greenwood to pay for the equipment.

---

3. The government seeks to hold only the corporate defendant Greenwood itself liable as "owner" of the Site.

4. Nevertheless, as defendants accurately point out, mere conclusory allegations need not automatically be taken as true. Defs' Mem. in Support of Motion to Dismiss at 7 (citing *Little v. FBI*, 1 F.3d 255, 259 (4th Cir.1993) (Michael, J., sitting by designation)).

D. High Point performed chemical analyses of products being developed by Greenwood.

E. From the period from approximately November 1968 until November 1970, High Point loaned approximately $47,000 to Greenwood without obtaining any security for the loan.

17. Between November 30, 1968, and October 20, 1975, Clarence Hustrulid was actively involved in operations at Greenwood. For example, in addition to owning approximately 25% of the shares of Greenwood during this period:

A. Hustrulid served as [P]resident and [T]reasurer of Greenwood.

B. After Greenwood was formed, Hustrulid visited Greenwood twice a month for three to four days at a time to reorganize and manage its financial affairs.

C. Hustrulid arranged to borrow funds on behalf of Greenwood.

D. Hustrulid personally participated in disputes between Greenwood and Frank O. Cockerille.

E. Hustrulid participated in day-to-day production decisions at Greenwood.

Complaint at ¶¶ 16–17.

## IV. "Operator" Liability under CERCLA

### A. The Statute's Purpose and Definitions

Congress enacted CERCLA "to address the increasing environmental and health problems associated with inactive hazardous waste sites." *Nurad Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992) (Wilkinson, J.). "[S]ince CERCLA is a remedial statute, its provisions should be construed broadly to avoid frustrating the legislative purpose." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir.1992) (Widener, J.) (citing *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1247 (6th Cir.1991)).

As the Complaint correctly recites at ¶ 42, Section 107 of CERCLA, 42 U.S.C. § 9607(a), provides, in pertinent part, that:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a . . . facility; [or]

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; . . .

shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State. . . . The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D).

■ To establish a *prima facie* case of liability under CERCLA, a plaintiff must allege that: (1) release of hazardous substances has occurred, (2) at a "facility," as defined by the statute, (3) that caused the plaintiff to incur response costs, and (4) that the defendants are "responsible parties," again, as defined by the statute and interpretive caselaw. *United States v. Fairchild Industries, Inc.*, 766 F.Supp. 405 (D.Md.1991).

■ It is uncontroverted that the substances identified in the Complaint at ¶ 23 are "hazardous substances" as understood by 42 U.S.C. § 9601(14) (West 1995). A "facility" is, for purposes of CERCLA,

any building, structure, installation, equipment, pipe or pipeline . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or . . . any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). The term "facility" as used in CERCLA should be broadly interpreted. *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532 (W.D.Mich.1989). Nonetheless, "a defendant operates a 'facility' only if it has authority to control the area where the hazardous substances were located." *Nurad, supra*, 966 F.2d at 843. The *Nurad* court, in so defining a "facility," expressly rejected the appellant's contention that the "facility" at

issue in that case encompassed the *entire property* on which the hazardous substances were located. As the court determined, for purposes of 42 U.S.C. § 9601(9):

> the only "area" where hazardous substances have "come to be located" is in and around the [hazardous materials'] storage tanks, so the relevant "facility" is properly confined to that area.

*Id.* at 842–43.

The term "owner or operator" is, somewhat circularly,[5] "... in the case of an onshore facility or an offshore facility, any person owning or operating such facility." 42 U.S.C. § 9601(20)(A) (West Supp.1998). An "onshore facility" is "... any facility ... of any kind located in, on, or under, any land or nonnavigable waters within the United States." *Id.* at (18) (West 1995). The term "person" means:

> an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

*Id.* at (21) (West 1995).

CERCLA defines "release" as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant).

*Id.* at (22). The "environment" is:

> the navigable waters, the waters of the contiguous zone, and the ocean waters ...; and ... any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the Untied States or under the jurisdiction of the United States.

*Id.* at (8)(A)–(B).

The factual allegations asserted trigger the protections of the statute and fall within the contours of the relevant definitions therein.

**B. The "Authority to Control" Test**

■ An "owner or operator" of a hazardous materials site may be liable under CERCLA for cleanup response costs if it possessed the authority to control the site, even if it lacked actual control over the same site. *Nurad, supra,* 966 F.2d at 842 ("authority to control—not actual control—[is] the appropriate standard") (citing *CPC Int'l, Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 788 (W.D.Mich.1989), *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 671–72 (D.Idaho, 1986)). This test

> ... is one which properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup. Under this standard, the district court [i]s entitled to consider a defendant's actual conduct as evidence of the authority to control ... [as long as] it ... [does] not inflate that item of evidentiary significance into a dispositive legal requirement.

*Id.* (citing *Riverside Market Dev. Corp. v. International Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir.1991), *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir. 1985)).

**C. Corporate Officers', Shareholders', and Sister Corporations' Potential Liability**

**1. The Legal Standard**

■ Under CERCLA, a company's corporate principals with sufficient authority to control a facility at the time hazardous material was discharged may be held liable for response costs incurred by the government in decontaminating the site when the principals served as directors or as President of the company at all relevant times. *Carolina Transformer Co., supra,* 978 F.2d 832; *see also City of North Miami, Fla. v. Berger,* 828 F.Supp. 401 (E.D.Va.1993). Similarly, a stockholder who actively participates in the

---

**5.** *See Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528 (E.D.Cal.1992) (circularity of CERCLA's definitions of "owner or operator" have their ordinary meanings rather than unusual or technical meanings.)

management of a corporation may be personally liable under CERCLA as an "owner or operator." *United States v. Amtreco, Inc.,* 809 F.Supp. 959 (M.D.Ga.1992).

At least one court has applied a "prevention test" in determining whether or not a corporate officer may be held personally liable as an operator under CERCLA; the focus of the test is whether the individual could have prevented the hazardous waste discharge or contamination at issue. *Robertshaw Controls Co. v. Watts Regulator Co.,* 807 F.Supp. 144 (D.Me.1992).

On the other hand, other courts have held that the President and majority shareholder of a corporation cannot be liable as an operator for the environmental actions of the company or its employees when he did not actively participate (*i.e.,* had no personal involvement) in the CERCLA dumping violations by the company's employees. *NutraSweet Co. v. X–L Engineering Corp.,* 933 F.Supp. 1409 (N.D.Ill.1996); *CBS, Inc. v. Henkin,* 803 F.Supp. 1426 (N.D.Ind.1992).

In any event, the relevant inquiry, under the governing Fourth Circuit precedent must be whether High Point and Hustrulid possessed the "authority to control" environmental policy and activity at the Greenwood Site. This court interprets the authority to control standard to be rather less rigorous, particularly at the pleadings stage of litigation, than would be the "actively participate" test of the district court cases cited in the preceding paragraph.

### 2. Fourth Circuit Precedent and Related Authority

In *Carolina Transformer Co., supra,* 978 F.2d 832, a one-time company President, sole shareholder, and chairman of the board was held liable as an operator of the Superfund Site at issue. 978 F.2d at 837. Likewise, another director and President of the company was liable for response costs. *Id.* "[E]ach had the authority to control the Carolina Transformer facility at the time that transformer oil containing PCBs either was spilled or dumped there or leaked from the site into

the surrounding groundwater." *Id.* Importantly, this other director and President, Kenneth Strother, "described [in his deposition] his basic responsibilities as *everyday operations* of the company, delegation of authority, management of the company; and agreed that he had *responsibility for the entire operation of the company.*" *Id.* (emphasis added).

Another Fourth Circuit case, *United States v. Dart Industries, Inc.,* 847 F.2d 144 (4th Cir.1988) (Ervin, J.), affirmed a district court's dismissal of a third-party complaint against a State environmental agency which was alleged to have been a responsible party under CERCLA because of its alleged participation in the operation of a hazardous waste site.[6] The district court found, and the Fourth Circuit agreed, that the South Carolina Department of Health and Environmental Control ("DHEC") was not an owner or operator for purposes of CERCLA. *Id.* at 145. The agency "issued various permits for waste disposal at the site, and required generators to comply with a waste tracking manifest system" when shipments were made to the site. *Id.* As well, DHEC "approved or disapproved applications to store wastes at [the site], inspected the site, and required proper transportation of the wastes delivered to [the site]." *Id.* at 146. *Dicta* from the case, however, bears on the fact pattern presented here; the Fourth Circuit distinguished the agency's mere "governmental supervision" of the site from a situation in which an agency "managed ... *employees* or *finances* at the ... site." *Id.* (emphases added). Similarly, the court pointed out that the third-party plaintiff was "unable to specify any 'hands on' activities by DHEC that contributed to [ (as opposed to 'caused') ] the release of hazardous wastes." *Id.*

In *Berger, supra,* 828 F.Supp. at 410, an owner of some thirty percent (30%) of a landfill operating company, "Munisport, Inc.," who also was its President, was held liable for response costs under CERCLA. The landfill operating company had contracted with an "ABC Demolition Co." to develop

---

**6.** A State or local government agency which causes or contributes to the release of hazardous material potentially is liable under CERCLA to the same extent as any private entity. 42 U.S.C. § 9601(20)(D).

the site property. *Id.* at 405. The same individual owner possessed fifty percent (50%) of the shares of ABC. *Id.* The court held the individual, a Said Haddad, liable because he not only met, but exceeded, the Fourth Circuit's "authority to control" test. As the court found, he "exercised direct and substantial control over the day-to-day operations of the landfill." *Id.* In other words, he not only possessed authority to control the site in question, he, in fact, put such authority into active effect. Quite apart from the actual control the individual exercised, the court made clear that Haddad possessed ample authority to control the site because he "owned 32.5% of Munisport, 50% of the shares of ABC, and acted as a director and officer of each." *Id.* at 410. The court held that "[g]iven this, and given his actual involvement in the day to day operations of the landfill, Haddad ... was manifestly an 'operator' under the *Nurad/Carolina Transformer* 'authority to control' standard, and thus falls squarely within the class of 'liable persons' under CERCLA." *Id.*

Another individual, Frank Kaufman also was held to fall squarely within the same class. *Id.*

> Like Haddad, Kaufman owned 32.5% of Munisport and 50% of ABC, acting as Treasurer and President, respectively of these companies. In his role as Treasurer of Munisport, it is undisputed that Kaufman *signed checks,* maintained insurance on equipment, and had some *administrative role* relating to the payroll, accounts payable, and accounts receivable. The record further reflects that Kaufman obtained information concerning landfilling operations at the project's inception, communicated rate increases to landfill customers, and *attended major meetings* concerning the project. In addition, Kaufman visited the Munisport site on numerous occasions, *making visits on a bi-weekly basis at one point in time.*

*Id.* (emphases added). The court continued:

> While these disputes [over Kaufman's involvement in the actual management of the landfill operations] preclude entry of summary judgment as to liability on the basis of actual control, ample evidence in the record concerning Kaufman's involvement in site operations establishes his authority to control Munisport's operations. In this regard, quite apart from any actual involvement he may have had in the landfill operations, Kaufman, like Haddad, unquestionably retained the authority to direct and influence, the *management of the entire development project venture.*

*Id.* at 410–11 (emphasis added). With respect to imposing CERCLA operator liability on corporate shareholders and officers, the court instructed that

> the relevant inquiry is not whether a particular shareholder possesses 51% or more of the shares of a company. Rather, it is whether the corporate officer, because of the realities of the corporate power structure, has the authority and the ability to control the management of the company if he so chooses. Put another way, the relevant inquiry is whether the officer is a managing shareholder who, for some reason—whether by virtue of majority ownership or the agreement of the other shareholders, or the indifference or acquiescence of the other shareholders—*can direct the overall operations of a corporation and, in doing so, has the authority to control the facility in question.* While the ability to exert such control is more readily apparent where the defendant is a sole or majority stockholder, the broad, remedial purpose of CERCLA militates against restricting the scope of operator liability only to those shareholders. Where, as here, a corporate officer is a managing shareholder and shares equally the ultimate decisionmaking authority for a company's operations, he may be held liable as an 'operator' for the release of hazardous substances at a 'facility' operated by the company.

*Id.* at 411.

▇▇▇ CERCLA liability may attach when one corporation has apparent or actual authority over the management of another corporation. Even outside of the parent-subsidiary relationship, such liability may exist as between two more loosely-affiliated corporate entities. In *Lansford–Coaldale Joint Water Authority v. Tonolli Corp.,* 4 F.3d 1209 (3d

Cir.1993), the circuit court remanded in part a case in which the district court, "without explanation," had entered post-trial judgment on behalf of a defendant sister corporation of the principal defendant corporation. 4 F.3d at 1213. In support of this holding, the court first instructed that "[t]he determination whether a corporation has exerted sufficient control to warrant imposition of operator liability requires an inherently fact-intensive inquiry...." *Id.* at 1222 (citing *John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 408 (1st Cir.1993)). The relevant focus, in such an inquiry, must be "the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions." *Id.* Such involvement, the court made clear, is sufficient for the imposition of CERCLA liability "even without evidence that a corporation controlled the *environmental decisions* of an affiliated corporation as long as there exist other factors which sufficiently demonstrate *pervasive control.*" *Id.* at n. 13 (citing *United States v. Kayser–Roth Corp.,* 910 F.2d 24, 27 n. 8 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991)) (emphases added); 4 F.3d at 1222 (citing *CPC Int'l, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549, 573 (W.D.Mich.1991)). Significantly, the court analyzed the overlapping relationship between sister corporations not under the "authority to control" test, but under the more exacting "actual control" test of the Third Circuit. Nonetheless, under that test, "[N]ot only may a parent corporation be deemed the operator of its subsidiary, but a corporation may also be considered the operator of its sister corporation." *Id.*

### 3. The Standard and Caselaw Applied

Certainly, at this stage, the facts, as pleaded, do not rule out "operator liability" because, during discovery, sufficient evidence could be unearthed enabling the U.S. to prove the legal requirement of "authority to control," referenced above. Particularly, with respect to defendant Hustrulid, the defendants cannot now establish that the United States "would not be entitled to relief

under *any* facts which could be proved in support of [its] [operator liability] claim." *Schatz, supra,* 943 F.2d at 489 (emphasis added); *see also Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. 99.

Although Hustrulid contends that he was but the "nominal" President of Greenwood, the Complaint specifically alleges that he "participated in day-to-day production decisions at Greenwood." Complaint ¶ 17(E). Moreover, Hustrulid's alleged power over the administrative and financial divisions of Greenwood is, consistent with the court's language in *Berger,* a sufficient indicia of an authority to control, at least indirectly (but no less definitely), the hazardous waste storage and disposal processes of the company.[7] For purposes of a Rule 12(b)(6) motion, the court must treat as truth the allegations concerning Hustrulid's involvement in the running of the Greenwood company. Doing so, it finds that such participation meets *Nurad's* "authority to control" standard, if not the more stringent test of actual control not required in this Circuit.

■ As to defendant High Point, the well-pleaded factual allegations in the Complaint likewise do not preclude a conclusion that it possessed the authority to control the Greenwood site. While the company presents itself as a mere self-styled "supplier" of goods and services (financial and otherwise) to Greenwood, High Point's Mem. in Support of Motion to Dismiss at 10 (citing *United States v. Iron Mountain Mines, Inc.,* 987 F.Supp. 1277, 1997 WL 769420 at *6, n. 14 (E.D.Cal. 1997); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155 (7th Cir.1988)), the Complaint alleges far more.

Specifically, High Point's authority to control the hazardous material processes at Greenwood are alleged to be demonstrable by the well-pleaded factual allegations that: (1) certain employees of High Point, compensated by High Point rather than by Greenwood, developed chemical and other formulas for the products manufactured by Greenwood, Complaint ¶ 16(A); (2) certain employ-

---

7. This court does not deem it a necessary predicate condition for the attachment of CERCLA liability that a defendant have "dirt on his

hands" to the point of having personally disposed of hazardous materials.

ees of Greenwood, remunerated by High Point, again, rather than by Greenwood, signed checks on behalf of Greenwood, *id.;* (3) certain High Point employees, acting as the paid agents only of High Point, dealt with product suppliers on behalf of Greenwood, *id.;* (4) High Point rendered maintenance work to Greenwood *gratis,* donated equipment to Greenwood, ordered and paid for products delivered to Greenwood, and performed chemical analyses of products made at the Greenwood site, *id.* at 16(A), (B), and (E).

These allegations suffice, in the pleadings stage of this litigation, at least, to suggest that High Point exercised the authority to control, or actually did control, manufacturing and hazardous materials' disposal operations at the Greenwood site. The relationship apparently existing between High Point and Greenwood appears that of a sister company controlling, or possessing the authority to control, key elements of a hazardous site actually owned by another corporation. Under *Lansford–Coaldale, supra,* 4 F.3d at 1222 and after considering all of the evidence discovered in this "inherently fact-intensive inquiry," CERCLA liability might be imposed based on High Point's involvement in Greenwood's day-to-day operations and policy-making decisions. Even if the government's has failed to plead that High Point controlled the "environmental decisions" of Greenwood, discovery well might confirm the allegations tending to demonstrate a "pervasive control" by the former corporation of the latter. *See id.* at 1222 n. 13; *see also Kayser–Roth Corp.,* 910 F.2d at 27 n. 8.

Accordingly, the court will deny the motions to dismiss made by defendants High Point and Hustrulid.

## V. Motions to Transfer Change of Venue

■ Under 28 U.S.C. § 1404(a), "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought." Nevertheless, a "plaintiff's choice of forum should rarely be disturbed unless the balance is strongly in favor of the defendant." *Bertnick v. Home Fed. Sav. & Loan Ass'n,* 337 F.Supp. 968, 970 (W.D.Va.1972).

High Point and Mr. Hustrulid offer several reasons in support of their motions to transfer venue to the Middle District of North Carolina: (1) the Middle District would be as convenient, or more so, for the witnesses and parties, (2) the court there would be able to compel the attendance of North Carolina witnesses, by virtue of the one hundred (100) mile subpoena rule of Fed.R.Civ.P. 45 (West 1998), (3) trial in North Carolina would be less expensive and (4) trial in North Carolina would better enable Mr. Hustrulid, a frail old man in a nursing home, to participate in his own and High Point's defense.

The government replies that countervailing considerations (especially the fact that the other two defendants in this action, Greenwood and Cereghino, reside in Albemarle County, Virginia) militate in favor of retaining the venue properly lodged in this court. Those countervailing considerations, which the court takes as the more persuasive on this issue, are: (1) the Site is located in the Western District of Virginia; (2) plaintiff's choice of forum is entitled to deference; (3) the Commonwealth of Virginia, an intervenor in this action,[8] is "located" in this District for venue purposes; (4) at least as many wit-

---

**8.** Pursuant to 42 U.S.C. § 9613(i) and Fed.R.Civ.P. 24(a), the Commonwealth moved to intervene as a matter of right in this action. The court granted the motion, by written Order of April 10, 1998. The Commonwealth had asserted that it wished to intervene to recover its own environmental response costs from defendants to the tune of $1.6 million. The Commonwealth provided this amount to the U.S. for the Greenwood cleanup.

    Rule 24 reads:
    (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to inter-

vene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

    Section 113 (i) of CERCLA sets forth the statutory basis for intervention, sufficient to meet the Fed.R.Civ.P. 24(a)(1) requirement; as well, the conditions for CERCLA intervention are "virtually identical" to those required by Fed.R.Civ.P. 24(a)(2), *to wit:*

nesses may come from Virginia as North Carolina (the one hundred mile rule works both ways); (5) High Point may choose to implead other parties from various judicial districts in America for whom the Middle District of North Carolina would not be any more convenient than the Western District of Virginia.

On balance, this court finds that even if the venue question cuts in favor of High Point and Mr. Hustrulid, it does not cut "strongly" in favor of them. *Bertnick, supra,* 337 F.Supp. at 970. The plaintiff's choice of forum will not be disturbed. Therefore, the court will deny the motions of defendants High Point and Hustrulid to transfer venue.

### VI.

The court concludes this opinion by commenting that the most of the arguments otherwise capably presented by the defendants in support of their contention that they cannot, as a matter of law, be construed as "operators" of a hazardous site for purposes of CERCLA, lend themselves far better to motions for summary judgment than to the instant motions to dismiss. This court is constrained at this stage of the proceedings from looking beyond the factual allegations contained within the four corners of the United States' Complaint. While discovery ultimately may confirm defendants' statement at the hearing on the present motions that "we are *not* liable," plaintiff here has made the requisite threshold allegations to survive a motion to dismiss. Defendants' arguments must be reserved for another day when, after evidence has been discovered, a motion for summary judgment may lie. *See Anderson v. Wiggins,* 1997 WL 470367, *3 (W.D.Va. 1997) (Michael, J.).

For the moment, however, the defendants' motions to dismiss for failure to state a claim and their motions to transfer venue must be denied.

In any action commenced under this Act ... in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest. . . .

42 U.S.C. § 9613(i).